**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-18-00927-001-PHX-DGC |
| Plaintiff, | **ORDER** |
| v. | |
| Timothy Martin Lewis, | |
| Defendant. | |

Defendant Timothy Lewis is charged with certain firearm offenses. Doc. 17. The firearms were found in his vehicle during a traffic stop. Lewis has filed a motion to suppress evidence obtained as a result of the stop. Doc. 22. The motion is fully briefed. Docs. 40, 45. For reasons stated below, the Court will deny the motion in part. A telephonic conference will be held on **December 20, 2018 at 10:00 a.m.** to address whether an evidentiary hearing is required for the remainder of the motion.

**I.    Background.**

On Thursday June 21, 2018, Lewis was driving a rented Dodge Charger west on Interstate 10 near Quartzite, Arizona. He was returning to San Francisco from a trip to Phoenix, accompanied by his cousin Todd. At approximately 3:14 p.m., Arizona Department of Public Safety ("DPS") Trooper Robert Huijkman observed Lewis's car travelling too close to a semi-truck. Huijkman pursued the car and pulled it over a few

minutes later near milepost 48.  The video and audio equipment in Huijkman's patrol car recorded the entire stop.  *See* Doc. 44.  The facts set forth in this background section are based on a review of the recordings, a transcript of the audio recording of the stop (Doc. 47-1), and Huijkman's report (Doc. 40-1 at 1-13).

Huijkman approached the car and requested Lewis's driver's license and the rental car agreement, which Lewis provided.  Huijkman asked Lewis to come back to his patrol car.  Lewis complied.  Huijkman checked Lewis for weapons and found none.  He got into his patrol car and rolled the windows down.  Lewis stood near the passenger side window of the patrol car.  Huijkman said he was going to write a warning and cautioned Lewis to stay at least three seconds behind other vehicles.

Huijkman asked Lewis what he was doing that day.  Lewis responded that he was heading home from a business trip to Phoenix and his passenger was on vacation and along for the ride.  Huijkman inquired further about the nature of Lewis's business and the trip to Phoenix.  Lewis explained that he had an investing company, was looking into cars in the Phoenix area, and was trying to build business credit.  This answer made no sense to Huijkman.  *See* Doc. 40-1 at 7.  He asked whether Lewis had legitimate business meetings and whether the trip paid off.  Lewis said he had only done some research and further explained the nature of his business concept – a ride-sharing business similar to what other companies offered in San Francisco and Phoenix.  Huijkman asked how long Lewis had been in Phoenix, and Lewis said he travelled there on Monday and stayed a few days.

Huijkman apologized for taking so long to write the warning, explaining that his computer had to start back-up and was just "circling."  He asked about the passenger.  Lewis said Todd was his cousin.  He asked who rented the car, and Lewis said it was his fiancée, Jessica Harrison.  Huijkman confirmed this from the rental agreement.

Huijkman's computer started and he asked for Lewis's social security number.  He then asked where they stayed on the trip.  Lewis said the Three Palms hotel in Scottsdale.  He asked for Lewis's phone number and followed up with several more questions about Lewis's business and what he did for a daytime job.  Lewis explained that he had something

established in San Francisco and was seeking to establish business credit in order to finance a fleet of cars.

Huijkman exited his patrol car and approached the passenger side of Lewis's vehicle to see if Todd could find the vehicle registration in the glove box. He observed that Todd's hands were shaking and his breathing appeared accelerated. He asked Todd some of the same questions he had posed to Lewis. Todd said they had arrived in Phoenix on Sunday or Monday, had stayed a few days at Motel 6 or the Three Palms hotel, and that he was on vacation while Lewis was there on business. Huijkman asked what Todd did while Lewis was conducting business. Todd explained that he had just recently moved from Texas, had not seen Lewis for a while, and sat by the pool when Lewis was away. When Todd was not able to find the registration, Huijkman returned to his patrol car to complete the warning.

Huijkman asked Lewis what Todd did while he was conducting business in Phoenix. Lewis said they "were together" and he "didn't do much business." Huijkman found this statement inconsistent with what Todd had said. *See id.* at 9.

Huijkman completed the written warning and Lewis signed it. As Huijkman was scanning the signature into his computer system, he asked whether Todd had been in trouble before because he was shaking badly and it is unusual for a passenger to be that scared. Lewis said Todd was scared of everything, even women. Huijkman asked where Todd was from, and Lewis said San Francisco and they had "both lived out there all [their] lives." This contradicted Todd's statement that he recently had moved from Texas.

Huijkman gave Lewis the warning and returned his license and the rental agreement. At this point, the traffic stop had lasted approximately 16 minutes. *See id*. at 10. Huijkman told Lewis that he enforces traffic laws but also looks for criminal activity, noting that a lot of drugs are transported on Interstate 10. He asked whether there were any drugs, weapons, or large amounts of currency in the car. Lewis said no. Huijkman expressed concern about inconsistencies in the answers Lewis and Todd had given. Lewis explained that if Huijkman was talking about him leaving Todd at the hotel, he had in fact done so a

few times to meet with another romantic partner, but did not want to talk about it because he had a fiancée. Huijkman asked for Lewis's consent to search the car. Lewis did not consent and asked why Huijkman was asking so many questions. Lewis observed that the questioning was a bit much for following another vehicle too closely.

Huijkman asked if he could walk his drug-sniffing dog, Klea, around the car. Lewis consented. Huijkman walked Klea around the car and she alerted positively to the front passenger door. Huijkman, with the assistance of other DPS troopers who had arrived on the scene, searched the car and found multiple guns and some ammunition. No drugs were found.

Lewis and Todd were transported to the Quartzite police station for interviews with ATF agents. Todd was released after the interviews, but Lewis was detained because his prior felony conviction made him a prohibited possessor of the guns.

Huijkman prepared a report one week after the traffic stop. Doc. 40-1 at 1-13. With respect to his questioning after he issued the warning, Huijkman identified three factors that led him to believe criminal activity was afoot: Todd's nervous behavior, conflicting stories about staying together in Phoenix and where Todd lived, and the illogical story about the purpose of being in Phoenix. *Id.* at 10.

The government filed a criminal complaint on June 22, 2018. Doc. 1. A superseding indictment charges Lewis with being a felon in possession of a firearm in violation 18 U.S.C. § 922(g) (count one), conspiracy under 18 U.S.C. § 371 (count two), and providing false statements in connection with the acquisition of firearms in violation of 18 U.S.C. § 924(a) (counts three through seven). Doc. 17.

Pursuant to Federal Rule of Criminal Procedure 12(b)(3), Lewis moves to suppress all evidence obtained as a result of the traffic stop. Doc. 22. He contends that the evidence was obtained in violation of the Fourth Amendment's bar against unreasonable searches and seizures because the stop was unnecessarily prolonged and not supported by reasonable suspicion of criminal conduct. *Id.* at 10-16.

**II.  Fourth Amendment Standards for Traffic Stops.**

1    The Supreme Court has made clear that traffic stops generally can last only as long

2  as is reasonably necessary to carry out the "mission" of the stop.  *Rodriguez v. United*

3  *States*, 135 S. Ct. 1609, 1614-16 (2015).  That mission includes "determining whether to

4  issue a traffic ticket" and "checking the driver's license, determining whether there are

5  outstanding warrants against the driver, and inspecting the automobile's registration and

6  proof of insurance."  *Id.* at 1615.  "On-scene investigation into other crimes . . . detours

7  from that mission."  *Id.* at 1616.

8      "An officer's inquiries into matters unrelated to the justification for the traffic stop,"

9  however, "do not convert the encounter into something other than a lawful seizure, so long

10 as those inquiries do not measurably extend the duration of the stop."  *Arizona v. Johnson*,

11 555 U.S. 323, 333 (2009).  And officers may "perform unrelated investigations that prolong

12 a stop [if] they have 'independent reasonable suspicion justifying the prolongation.'"

13 *United States v. Gorman*, 859 F.3d 706, 714 (9th Cir. 2017) (quoting *United States v.*

14 *Evans*, 786 F.3d 779, 787 (9th Cir. 2015)).

15     "Reasonable suspicion 'exists when an officer is aware of specific, articulable facts

16 which, when considered with objective and reasonable inferences, form a basis

17 for *particularized* suspicion."  *Evans*, 786 F.3d at 788 (quoting *United States v. Montero-*

18 *Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (emphasis in *Montero-Camargo*)).

19 "Although an officer's reliance on a mere 'hunch' is insufficient to justify a stop, the

20 likelihood of criminal activity need not rise to the level required for probable cause, and it

21 falls considerably short of satisfying a preponderance of the evidence standard[.]"  *United*

22 *States v. Arvizu*, 534 U.S. 266, 273 (2002) (citations omitted).

23     In determining whether an officer had a particularized and objective basis for

24 suspecting the person stopped of criminal activity, "the totality of the circumstances – the

25 whole picture – must be taken into account."  *United States v. Cortez*, 449 U.S. 411, 417

26 (1981).  This assessment involves the "various objective observations, information from

27 police reports, if such are available, and consideration of the modes or patterns of operation

28 of certain kinds of lawbreakers."  *Id.* at 418.  The assessment of the whole picture "must

raise a suspicion that the particular individual being stopped is engaged in wrongdoing."

*Id.*

**III.    Analysis.**

Lewis argues that the traffic stop constitutes an unlawful seizure under *Rodriguez* because Huijkman's questioning about matters unrelated to the stop's mission prolonged the stop beyond the time reasonably necessary to issue a warning and there was no reasonable suspicion of criminal activity to justify the prolongation.  Doc. 22 at 10-16.[1] The government contends that Huijkman's questioning did not unreasonably prolong the traffic stop because the length of the stop was dictated by the slow speed of his computer, which was required to issue the warning.  Doc. 40 at 10-12.[2]  The government further contends that by the time the mission of the stop was complete and the warning was issued, Huijkman had reasonable suspicion to further detain Lewis and investigate criminal conduct.  *Id.* at 11-15.[3]

**A.    The Time to Carry Out the Mission of the Stop and Issue the Warning.**

The stop lasted 16 minutes before Huijkman issued the warning.  As noted, the government contends that this amount of time was caused in part by the slow speed of

---

[1] Lewis does not dispute the lawfulness of the initial stop for following another vehicle too closely.  Doc. 22 at 3 & n.1 (citing A.R.S. § 28-730(A)); *see Whren v. United States*, 517 U.S. 806, 810 (1996).  But contrary to the government's assertion, Lewis does challenge the voluntariness of his consent to a dog sniff and the resulting probable cause for the search of the car given the allegedly unlawful seizure that occurred before the dog sniff and search.  Doc. 22 at 13.  "If the rule in *Rodriguez* and *Evans* is to have any force, the police cannot prolong a driver's detention for the purpose of eliciting consent for a search . . . and then rely on that consent to excuse the length of the stop."  *United States v. Ward*, No. 16-cr-00485-JST, 2017 WL 1549474, at *4 (N.D. Cal. May 1, 2017).

[2] Huijkman's patrol car was equipped with a "TraCS" system.  "TraCS" stands for "Traffic and Criminal Software," an automated law enforcement reporting system. *See United States v. Griffin*, No. 18-cr-100-pp, 2018 WL 4929397, at *2 n.2 (E.D. Wis. Oct. 11, 2018); TraCS Solution, https://www.l-tron.com/ solutions/solutionselectronic-ticketing-e-citation/tracs-solution/ (last visited Dec. 3, 2018).

[3] The government does not dispute that Lewis was not free to leave after the warning or that his continued detention constituted a seizure for Fourth Amendment purposes.  *See id.* at 12; *Arvizu*, 534 U.S. at 273 ("The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." (citing *Terry*, 392 U.S. at 9; *Cortez*, 449 U.S. at 417)).

Huijkman's computer. Doc. 40 at 10-12. It is not clear from Lewis's briefs whether he challenges this assertion. Nor is it clear whether an evidentiary hearing is needed to resolve any such challenge or other factual disputes concerning the pre-warning duration of the stop. A telephonic conference will be held on **December 20, 2018 at 10:00 a.m.** to address these issues.

**B.  Reasonable Suspicion Existed to Prolong the Stop After the Warning.**

Based on a careful review of the recordings of the traffic stop, Huijkman's report, and the parties' briefs and relevant case law, the Court concludes that the objective facts known to Huijkman provided reasonable suspicion to continue the stop after the warning was issued. In other words, by the time Huijkman issued the warning, objective facts provided reasonable suspicion that justified his prolonging the stop to ask Lewis whether he would consent to a search of the vehicle or a dog sniff.

Huijkman stated in his report that his suspicion of criminal activity was based the following facts:

1.  Signs of nervousness from the passenger: hands shaking, rapid breathing. Although a truthful person can become nervous in the presence of law enforcement, his behavior seemed more nervous compared to other passengers I have encountered.

2.  Conflicting stories between the driver and passenger. Specifically about them staying together in Phoenix, and the passenger just moving from Texas.

3.  Illogical story about the purpose of being in Phoenix. The business trip did not include any meetings and he was just out here to look. This supposed business just started 2.5 months ago and he was now looking to expand to Phoenix although he was still trying to build up his business credit.

Doc. 40-1 at 10.

**1.  Todd's Nervous Behavior.**

Huijkman stated during the traffic stop and noted in his report that Todd was shaking badly and that this was unusual for a passenger. Docs. 40-1 at 9; 47-1 at 21. Although

1    nervousness, standing alone, is not enough to justify an officer's detention of a suspect

2    after he has satisfied the purpose of the stop, *see United States v. I.E.V.*, 705 F.3d 430, 438

3    (9th Cir. 2012), it is "a pertinent factor in determining reasonable suspicion," *Wardlow*,

4    528 U.S. at 124.

5                              **2.    Conflicting Stories.**

6    　　　　Todd told Huijkman that he sat by the hotel pool while Lewis was conducting

7    business. Doc. 47-1 at 14. When Huijkman then asked Lewis what Too did while Lewis

8    was engaged in business, Lewis responded: "No, we were together. I didn't do much

9    business. It was just, you know, looking into stuff. That's all." *Id.* at 16. Huijkman

10   correctly found these responses inconsistent. When he later pointed this out to Lewis,

11   Lewis said that he left Todd at the room two or three times, but did not previously

12   mentioned this to Huijkman because Lewis was spending time with "another partner" even

13   though he has a fiancé. *Id.* at 22. The Court concludes that this later attempt to explain the

14   inconsistency did not eliminate the inconsistency as a basis for suspicion, especially when

15   Lewis's initial answers to Huijkman suggested that he was in Phoenix for business

16   purposes.

17   　　　　Huijkman also correctly found a flat contradiction between Lewis's statement that

18   he and Todd had lived in San Francisco all their lives and Todd's statement that he recently

19   had moved from Texas. Doc. 40-1 at 9; *see* Doc. 47-1 at 16, 22.

20   　　　　Inconsistent answers to routine questions are a factor which supports reasonable

21   suspicion. *United States v. Bautista*, 684 F.2d 1286, 1287, 1291 (9th Cir. 1982).

22                              **3.    Purpose of the Trip.**

23   　　　　Lewis stated, inconsistently, that he was in Phoenix on a "[b]usiness trip" and that

24   he "didn't do much business." Doc. 47-1 at 7, 18. Huijkman also found Lewis's story

25   about the purported business trip implausible because no meetings took place and Lewis

26   claimed to be planning to purchase a "fleet of cars" when his business was only 2.5 months

27   old and he was still trying "to get my business credit." Doc. 40-1 at 7, 10, 12. Implausible

28   stories about the purpose of a trip can, in conjunction with other factors, constitute

reasonable suspicion. *See United States v. Rojas-Millan*, 234 F.3d 464, 470 (9th Cir. 2000) (finding travel plans to be "oddly vague" and sufficient to establish reasonable suspicion where the defendant had driven nearly 200 miles to meet a friend but did not know how to get in touch with him); *United States v. Contreras*, 506 F.3d 1031, 1036 (10th Cir. 2007) (observing that "implausible travel plans can form a basis for reasonable suspicion").

### 4.    Other Factors.

As noted, the Court must consider "the totality of the circumstances – the whole picture[.]" *Cortez*, 449 U.S. at 417.  The Court may consider all facts known to Huijkman at the time of the traffic stop, even if Huijkman did not specifically rely on the same facts when deciding to prolong the stop.  As the Ninth Circuit has explained:

> The standard for determining whether probable cause or reasonable suspicion exists is an objective one; it does not turn either on the subjective thought processes of the officer or on whether the officer is truthful about the reason for the stop.  If, for example, the facts provide probable cause or reasonable suspicion to justify a traffic stop, the stop is lawful even if the officer made the stop only because he wished to investigate a more serious offense.

*United States v. Magallon-Lopez*, 817 F.3d 671, 675 (9th Cir. 2016) (citations omitted); *see also Davenpeck v. Alford*, 543 U.S. 146, 152 (2004) ("Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." (citing *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). In addition to the facts identified above, reasonable suspicion is supported by several additional facts known to Huijkman.

First, Lewis was driving a rental car. Docs. 40-1 at 7, 4.  This fact is relevant to the reasonable suspicion analysis because those engaged in unlawful conduct often use rental cars to transport contraband.  *See United States v. Williams*, 808 F.3d 238, 247 (4th Cir. 2015) (accepting as a general proposition that some drug traffickers use rental cars); *United States v. Finke*, 85 F.3d 1275, 1277 (7th Cir. 1996) (noting that officer was concerned about the rental car because he knew "drug couriers often used rental cars to avoid asset forfeiture laws"); *United States v. Contreras*, 506 F.3d 1031, 1036 (10th Cir. 2007)

1    (crediting the idea that "drug couriers often use third-party rental cars").

2         Second, as Huijkman explained to Lewis before requesting consent for the dog sniff,

3    there are "a lot of drugs being transported up and down these highways."  Doc. 47-1 at 22.

4    Indeed, "Interstate 10 is a common drug route[.]"  *United States v. Gutierrez*, No. CR 09-

5    00760 RB, 2010 WL 11483960, at *10 (D.N.M. Apr. 12, 2010).

6         Third, when Huijkman asked Todd where he and Lewis had stayed in Phoenix, Todd

7    displayed some uncertainty: "Motel 6. . . .  Three Palms.  One of them.  One of the Two."

8    Doc. 47-1 at 17.  The fact that Todd could not identify the specific hotel where he had just

9    spent three days – a hotel he allegedly had left only hours earlier – would cause a reasonable

10   officer to be suspicious of the travel plans and itinerary.  *See United States v. Riley*, 684

11   F.3d 758, 761-63 (8th Cir. 2012) (defendant's failure to remember the name of the hotel

12   where he stayed supported reasonable suspicion).

13                    **5.      Reasonable Suspicion Conclusion.**

14        "Reasonable suspicion is formed by 'specific, articulable facts which, together with

15   objective and reasonable inferences, form the basis for suspecting that the particular person

16   detained is engaged in criminal activity.'"  *United States v. Lopez-Soto*, 205 F.3d 1101, 1105

17   (9th Cir. 2000) (quoting *United States v. Michael R.*, 90 F.3d 340, 346 (9th Cir. 1996)).  As

18   noted above, "the likelihood of criminal activity need not rise to the level required for

19   probable cause."  *Arvizu*, 534 U.S. at 274 (quotation marks and citations omitted).  Because

20   probable cause exists when the facts show a "fair probability" that criminal activity is afoot,

21   *United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006) (quotation marks and citation

22   omitted), reasonable suspicion requires something less than a fair probability.  It requires

23   only specific, articulable facts that support a reasonable suspicion that a person is engaged

24   in unlawful conduct.

25        The Court concludes that the objective facts known to Officer Huijkman supported

26   a reasonable suspicion in this case.  These facts included Todd's extreme nervousness,

27   conflicting statements about where Todd lived, conflicting statements about whether Lewis

28   and Todd stayed together in Phoenix, Lewis's implausible business plans, the fact that

Lewis was driving a rental car on a known drug route, and Todd's uncertainty about the specific hotel they had stayed at in Phoenix. All of these facts were known to Huijkman by the time he issued the warning and provided a particularized and objective basis for suspicion sufficient to continue the stop and request consent for the dog sniff. *See Arvizu*, 534 U.S. 277-78 (although each factor "alone [was] susceptible of innocent explanation," together "they sufficed to form a particularized and objective basis for . . . stopping the vehicle"); *Rojas-Millan*, 234 F.3d at 470 (finding that a "combination of suspicious factors justified the short continued detention of the vehicle"); *United States v. Hill*, 195 F.3d 258, 271 (6th Cir. 1999) (finding that inconsistent stories about the itinerary, the implausible explanation for the trip, and the nervous behavior exhibited throughout the stop were sufficient for reasonable suspicion). As a result, Huijkman did not violate Lewis's Fourth Amendment rights when he extended the stop to request consent for the dog sniff. Lewis consented, and the drug dog's alert provided probable cause to search the vehicle – a point Lewis does not contest.

**IT IS ORDERED:**

1.      Defendant Lewis's motion to suppress (Doc. 22) is **denied in part** – with respect to the lawfulness of the post-warning detention.

2.      A telephonic conference will be held on **December 20, 2018 at 10:00 a.m.** to address remaining issues.

Dated this 17th day of December, 2018.

David G. Campbell
Senior United States District Judge

- 11 -